And we will hear argument next in United States v. Wilkes. Good morning. May it please the Court. Shereen Charlotte, Federal Defenders of San Diego, on behalf of Appellant Brent Wilkes. This case requires reversal on multiple grounds. First, for denial of immunity to a defense witness. Second, because of an impermissible on a services fraud theory. Third, the money laundering convictions are infirm. And fourth, for prosecutorial misconduct. Turning first to the immunity issue. This Court's case of United States v. Svob set forth several requisites for determining when denying a defense witness immunity violates due process. And they said, there has to be a defense witness denied immunity. That one's the easy one. The testimony has to be relevant, easy also. The defense witness directly contradicts immunized government witnesses' testimony with the effect being a distortion of the fact-finding process. All those requisites were satisfied here. And I know the government contests the direct contradictions. So if the Court wishes, I'll go through them. First, with respect to immunized government witness Combs. Combs said Wilkes was billing for equipment neither ordered nor supplied. Excerpt of record 2055, 2060, and 2062. Counsel, have you referenced the Straub case? That's what I'm, I'm, yes. And when Straub discusses direct contradictions, Straub made two important points about them. It said that it just has to lead to an inference that the testimony was directly contradictory. Doesn't have to compel a finding. And Straub also said, the defense doesn't have to proffer a wall to get immunity for his brick. And finally, too, about the direct contradiction, Straub says, the effect of the contradiction isn't just the contradiction on that one point itself. It could cast doubt on the credibility of everything the government witness said. So we, we look at this. What's your strongest argument on contradictions? I think the contradictions about Combs and Wade's testimony, that Mr. Wilkes was billing for equipment he didn't supply for work he didn't do. That he made millions on this contract, when in fact, Williams says at 3680, that they lost money on this deal. And that Wade testified that there was a change in focus, this plan that he and Williams, that he and Wilkes, excuse me, cooked up to provide the government with worthless hardware at an overinflated price. When Williams was waiting by with people ready to do the scanning work, and Williams devised this 2004 project that, that Wilkes' company ended up being a subcontractor for. He knew there was document conversion work. And while I know the government also says that it's, Joel Combs backed away from this claim that he was the Panama project manager. So it's not an important contradiction. The reason I think it is, Judge, is because Combs got away with testifying about all of this overbilling and not supplying things and making the millions because he portrayed himself as occupying the role that Williams truly occupied. Combs said, I'm the project manager. And the district court, when there was objection to some of the testimony, said, well, he testified, he's the project manager, so he can testify about this stuff. Williams was the real project manager. And we made that very clear at excerpt of record 3670 and 3680. Williams would have said, I was the project manager. We were doing real work. We, Mr. Wilkes brought the equipment that he bought to Panama. And that's at ER 3680. Charlotte, let me ask you this. Yes. If I understand correctly, Straub was not on the books yet at the time of this trial, is that right? That's correct. So Judge Burns applied to some kind of different standard to deny this? Slightly, yes. He did say, though, that he found that the testimony of proposed witness Williams would counter immunized government witness testimony. And he found that at excerpt of record 2483, he says- Is that the, I have a transcript page. Do you have a different numbering system? Oh, gosh. In the upper right-hand corner, do you have a page number? I didn't, I have it written down. Okay, well, anyway, what does he say? That's okay, what's he say? I'll find it if you tell me. 2104. Okay, what's he say? He says, I'm concerned to hear about the level playing field because I have to tell you the proffer I have as to what this fellow can offer strikes me as material and relevant evidence that the defense would want to present to counter some of what's been presented by the United States through immunized witnesses. That's not exactly the same as contradiction. But he did not know that he needed to say directly contradict, but- Well, that's what I'm getting at. That's why I say the case wasn't extant at the time. So if we were to agree with you, wouldn't the remedy be to send it back and let him apply the right standard in the first instance? I mean, certainly that is what Straub did, and Straub won. And yes, that is an option for the Court. I do think, though, that there are direct contradictions, and the Court could look at this and agree that, I mean, the district court expressed this concern very strongly. Well, one of the problems I have with that, this proffer was made outside the presence of the prosecution. Isn't that right? Yes. So, I mean, he really didn't get the judge. Judge Burns really didn't get the, you know, both sides of the story about whether it contradicts or doesn't contradict. They got your side of the story. They didn't get the other side of the story. Well, he had heard the testimony, though. I didn't say he didn't hear the testimony, but I said he didn't hear from the government. He didn't. Okay. That is accurate. I mean, they certainly have the proffer now, and but I don't know how they would get around the fact that if someone says. Well, then if they can't, then you win. But, I mean, shouldn't we give Judge Burns the first opportunity to pass on this? To the extent that the Court thinks that the findings aren't clear and this decision couldn't be made, then yes, Straub does stand for that proposition, and that is the correct course. I mean, I do think, though, that the direct contradictions are apparent from the record and that the district court's findings that if Williams wasn't permitted to testify to counter some of this evidence, then in fact the fact-finding process would be distorted and that Straub supports that conclusion. And the reason that the fact-finding process would be distorted would be because as Straub found, Williams could cast doubt on the two most important government witnesses. I mean, Combs and Wade were the linchpin of the government's case. And if these multiple contradictions by Williams, who was actually a disinterested witness, I mean, he hadn't had contact with Mr. Wilkes, wasn't working for him, lived out in Virginia when Mr. Wilkes had been back here in San Diego, and he would have testified and cast doubt on the two most important government witnesses. And I think that it's important also for the Court to realize Joe Combs was a powerful witness emotionally for the government. He is my client's nephew. My client's sister's son came in and testified against him. And the defense was deprived of the ability to show that he was not truthful in that testimony. And deprived of that, the government then went on to argue and cross-examine Mr. Wilkes about the fact that Mr. Wilkes was hanging out there alone. There was, you know, nobody else backing him up. And that was the theme in the cross-examination, that it was just him against all these government officials. And that was the argument made in closing, that either you believe all these government witnesses or you believe Mr. Wilkes. That's the choice before you. You can't believe both. And that's a direct quote. And had, I mean, we take the position that wasn't a proper argument, but had the Court actually allowed Williams to testify, that argument couldn't have been made, because Mr. Williams would have corroborated Mr. Wilkes as well as discrediting the other. Now, what is it that Judge Burns actually found? Judge Burns' findings are set forth in Excerpt of Record 2482 through 2483. And he also makes additional statements at 2479 and 2492. At 2479, he says Williams' testimony is relevant, admissible, non-cumulative, and exculpatory. At 2483, he makes the statement that I spoke about in response to Judge Silverman's question with, I have to tell you, the proper is material and relevant, which would counter some of what's been presented by the United States through immunized witnesses. Counsel, those are conclusions by the Court. What was the conclusion based on? What were the findings that the Court reached to reach those conclusions? The Court said after hearing everything, including the proffers, and his finding would be that the fact-finding process would, in effect, be distorted. That's what he says at 2483. Well, is the effect of a refusal to grant immunity distorting the fact-finding process? I have to tell you, after hearing everything, including the proffers, I think the effect would be to do that. But what the Court did not hear is a cross-examination of the evidence that was presented in the proffer. Well, Your Honor, that's true. The Court didn't hear a cross-examination, but that is not our fault. We asked for, at page 2488, we asked in 2471, we said a question-by-question examination of Williams is what you should do. And the prosecutor right here at 2473 said, I don't think a question-by-question examination is warranted. And Judge Burns said, look, his counsel says he's going to invoke. I have a representation. He will invoke excerpt of record 3678. He is covered by the Fifth Amendment privilege. He would assert it. He may not be called as a witness. That's at excerpt of record 2495. So I wanted a question-by-question examination because the truth is, this witness wasn't my client. I wasn't allowed to have the access to him to be able to make the most detailed proffer that I could have. And the case decided by the Court after this occurred says that's what should be done. That is correct. And we actually think there were some cases before, and that's what I was telling Judge Burns, that I do think a question-by-question examination is the appropriate course. And a witness shouldn't be permitted to do that. So shouldn't we set it back so that that can occur? I did ask for that to occur, and I think it's a bit unfair that they shut me down about it. The government shut me down. Well, they hadn't read the case, nor had the Court, nor had you. Well, Straub, certainly. It hadn't occurred yet. That's true. And I certainly wasn't as prescient as I should have been. But, I mean, if that is what the Court thinks should happen here, then Straub supports that result. I mean, I do think that there's enough here. I mean, it's a mixed question of law and fact. And, of course, the district court's factual findings are reviewed for clear error. And I do think that the government didn't even argue with the findings. I'm concerned that I don't see any factual findings. I see only conclusions by the Court, having considered the proffer, that it would be relevant and contradictory. But I do also think, though, the Court said that he considered the proffer and found that the effect would be to distort the fact-finding process. And I think that is the finding that Straub — It's a conclusion, isn't it? I think it's also a finding, Your Honor. I'm not sure I quite understand the distinction. But what are the facts that support the finding? That's what I'm really pushing you on. The facts that support the finding are the facts of the proffer, that there were — there was evidence that Mr. Williams would testify. There was equipment that Mr. Wilkes bought and brought to Panama. Joel Combs said equipment wasn't supplied. Wade said the officials' concerns were justified. The concerns were equipment wasn't supplied. Williams would testify, according to the proffer and our 17b subpoena, that real work was being done. Combs said we're billing for work we didn't do. Wade said those concerns were justified. These are things, you know, the Panama project manager, the real identity of who that was, these were teed up precisely in front of the district court judge. Counsel, I'm looking at page 2491, where the court says what part of the calculus should be — should it be part of the calculus that presumably these things could all be testified to by Mr. Wilkes himself. He's not entirely foreclosed from offering this testimony or some part of it. Yes. It's not as if this testimony is so peculiar that absent the grant of immunity, the information couldn't come in. He could offer it. Well, and in fact, Your Honor, you know what? He did. He offered it. But what has that got to do with compelled immunity? Well, I don't think that it does. I don't think that that was correct. And Stroud certainly didn't impose any additional requirements. The next line, Ms. Sharlock, is that you say, Your Honor, that would be true. It would be true, but I said — I went on to say Mr. Wilkes has a Fifth Amendment right not to testify. Right, right. And, in fact, he was deprived of his witness, and so he did testify because he had nothing else. I mean, he should have been able to have Mr. Williams. And, Your Honor, also the government, in excluding Williams' testimony, then capitalized on the fact that Mr. Wilkes didn't have anybody. As I mentioned, the focus of the cross-examination was on how, oh, it's you against all the government officials. You have this big conspiracy theory. They're all against you. Williams would have said, yes, they were all against us. So, Your Honor, I do think that actually the — that he was really harmed by not having Mr. Williams and that there isn't any sort of requirement that, well, if you can testify to it yourself, it's all okay. It wasn't here. I'm also interested in your argument on the insufficiency of the money laundry. Yes. Could you say a word about that? Yes. Your Honor, I think it's clear after this Court's case of Bush that the Santos test renders these money laundering convictions infirm because, in fact, when proceeds is defined as profits, all Mr. Wilkes did, under the government's theory, as they charged it, as they argued it, as it was instructed, all Mr. Wilkes did was to defray the expense of this crime, whether it's bribery or the honest services fraud, with — was to defray the costs of that crime with its receipts. But wasn't there a connection made with Coastal Capital? Didn't all of that evidence get in? Oh, yeah. I mean, the evidence that the money was deposited in Parkview's account, and Parkview then took the money and actually deposited it in the account of Tommy Kaye's daughter. But I don't think — that doesn't change the character of things, Judge, because the Supreme Court's defined proceeds as profits and referred to the entire statute. And this Court's case in Bush said, you know, we're going to extend that definition to another subsection of the money laundering statute. We're not confining it to promotional money laundering. That's the government's first argument, is that definition should be confined to promotional money laundering. This Court said in Bush that's inaccurate. And nor does it make sense from statutory construction principles. But second, Bush also says, well, we're also going to look at whether or not the act of the elements of the underlying specified unlawful activity, bribery, honest services fraud, was a central component, whether the money laundering action was a central component of these elements of the underlying bribery. Of course it was. The wire transfer supposedly paid the bribe. How can it be anything but central? And Bush says, well, we also are going to look at whether or not that wire transfer that was the money laundering was actually a substantive count of the specified unlawful activity. It was. It was count 10. There's – I am a bit at a loss to see how this – the Santos decision can be avoided, especially as it's been interpreted by Bush, Van Alstyne, and Moreland. And even if – even if there was sufficient evidence somehow, the jury was clearly misinstructed, and this Court in Moreland has already found a misinstruction under Santos to be plain error. Counsel, you're down to about two minutes, so you may wish to reserve. Thank you. You may do so. We'll hear from the Governor. Good morning, Your Honors. My name is Jason Forge. I'm here on behalf of the United States. Your Honors, I want to put this entire case in context. And that context is this. This is a bribery case, Your Honors, and not just any bribery case. The largest bribery case in the history of Congress. And the reason why the meaning of this case is important is that puts all of the defense arguments in perspective. The one issue we're not arguing about today is whether or not the government proved beyond a reasonable doubt that Mr. Wilkes bribed Congressman Cunningham. They're not challenging the sufficiency of the evidence on that. And that bribery, Your Honor, really frames all these other issues because this is not a procurement fraud case. And as you heard from defense counsel and as you read from the defense brief, all of these supposed contradictions, and I would submit that they're not contradictions, they all go to billing practices, barcoding of equipment. Back in 1998, none of them, none of them touch, let alone contradict, let alone directly contradict, all of the, what the district court accurately described as avalanche of evidence of hundreds of thousands of dollars in meals, in trips, in prostitutes, $100,000 cash in the year 2000, $525,000 cash. But the problem, you're not content to leave this as a bribery case. You also want to make this a fraud case, you want to make it a money laundering case, and you want to do other things with it. Okay, so you're knocking down a straw man that no one is contesting. Everybody seems to agree you have a bribery. But you're not content to leave it at that. Well, Your Honor, what I would submit is, number one, the fraud case is based on the bribery. We argued one basis for that, and that was the bribery or kickback basis. So even the fraud aspect of the case was directly tied and completely dependent upon the bribery. And the money laundering, Your Honor, was also based on that specified unlawful activity. I say that we need to define what this case is about because we have to put in context these points, these very tangential issues regarding possible divergence of testimony concerning bar coding of equipment and billing for goods or services. I don't have a good handle on your money laundering theory. Could you go through that with me? Absolutely, Your Honor. The money laundering theory is actually very simple. We're talking concealment, just to get the ball rolling. We're talking about concealment money laundering. Exactly, and that's what's critical. Let's keep in mind, this is a bribery of a defense contractor's bribery of a San Diego congressman. Now, there is nothing essential about that crime that requires the transfer of funds from a shell entity in San Diego to a third-party financier in New York. Your theory is it was dirty money that they tried to conceal through transactions. Is that right? That is exactly right, Your Honor. What was the dirty money exactly? The dirty money, and we showed this overwhelmingly, the dirty money was the proceeds from one of the corrupt contracts. This was a contract that was awarded pursuant to an earmark? Correct. Isn't that a matter of public domain? What's concealed about that? That's out in front of God and everybody, that this payment was made. The payment on the contract? Yes. The payment on the contract was made. That is out there in front of the world, yes, Your Honor, but what is not out in front of the world is that Brent Wilkes is waiting and talking to Duke Cunningham about waiting to pay his half-million-dollar mortgage, waiting for the money from that contract. So the concealment is paying the bribe? The concealment, Your Honor, is that no, because the bribe is complete once they have that agreement, and they had that agreement long before that money came in. The bribery is complete long before that. What the concealment is, and in this case, actually presents a perfect contrast. The $100,000 bribe that I mentioned earlier, Judge Silverman, that came in the form of two checks directly from Brent Wilkes to Duke Cunningham. Not really, it said boat deposit on there, but not really concealed. This $525,000 goes from the government to Mitch Wade, from Mitch Wade to ADCS Inc., from ADCS Inc. to another account held by a shell entity, from that shell entity to an account held by Parkview Financial. See, I understand how that conceals the bribe. What I don't get is how that conceals the dirty money. It conceals, Judge Silverman, the source, and that is one of the elements of concealment money laundering. If the intent is to conceal the source of the money, it conceals the nature of the payment. That is one of the aspects of concealment money laundering. In other words, nobody looking at a wire transfer from WBR Equities to Parkview Financial would have any clue whatsoever that money was actually proceeds of this bribery scheme, and it was being used to pay off Duke Cunningham's mortgage. The bribery scheme is complete long ago. It's ongoing, but it's complete long ago. That money is proceeds of that scheme because they wouldn't have obtained the contract. They wouldn't have obtained that $6 million payment but for the bribery scheme, and so the concealment consists of the web of transactions, and again... So, if I understand you correctly, any time they spend any of the ill-gotten money, they go buy a car, they go buy a hamburger, whatever it is, that would be money laundering if they used the money from the contracts. No, because that would potentially raise a Santos or Van Elstein problem. Under Santos and Van Elstein, it's only the type of transaction that are essential to the perpetuation of the underlying unlawful activity. Those are the types of transactions that present a merger issue. Here, there is absolutely nothing essential about this bribery scheme that required Grant Wilkes to use a shell entity to send money to a third-party financier in New York. There was nothing essential about that, so this is not a merger issue at all. This scheme went on for years without that type of transaction. Could Wilkes do anything with the money and not commit money laundering, in your view of it? And not commit money laundering? Absolutely. If it was promotion under Santos, we would have to show profits. Suppose he went out and bought himself a house with the money. If he went out and bought himself a house with the money, then under Bush, that's potentially problematic for us. Suppose he paid off his own second mortgage. And did it above board? This is money coming from bank concealment? He pays off his second mortgage, period. He didn't wash it through a bunch of other accounts? I don't know that there's anything illegal about going through different accounts. There potentially is. If he had just paid off his second mortgage, that would probably be problematic for us under Bush, because we don't have a requirement, as we had here, that he had the specific intent, the specific design to conceal the nature and the source of that money, which is what the jury was instructed. As opposed to concealing the fact that he's making a bribe payment. Exactly. And so, the money launder here, Judge Silverman, is at opposite ends of a situation like in Santos or in Van Alstyne, where the transaction was a natural and unavoidable type of transaction, given the nature of the underlying criminal activity. This was not only avoidable, it had been avoided for years. He had never done this type of financial transaction. He did it on this occasion, and he did it to conceal what was really going on. If I could, I would like to return to the same theme, but shift the focus back to the immunity issue, because once we put this case in context as being a bribery case, what the defense is going to do. You still have to show the direct contradiction, do you not, on the straw? Unquestionably, you do. Judge O'Scanlan, that has to be shown, but what is. And so, I think you need to respond to Ms. Shurlick's argument on that. Well, Your Honor, I received the proffer late, but I still received it, and there is nothing in there. The argument, I'm more concerned about what she said in court today. And there's nothing in it. She referred to page ER 3680 as purportedly having an indication in there that Mr. Williams would say that they did not bill for equipment that wasn't provided.  And let's not forget, it's not just a direct conflict, direct contradiction. Even on the straw, it has to be a direct contradiction that is so significant that it deprives Mr. Wilkes of his due process right to a fundamentally fair trial. And that's. The district court concluded that this evidence would do that. Isn't that true? Judge Allekin, he did not conclude that. Let me quote the court, quote, directly contradicts the government's witness testimony on a relevant issue. Isn't that what the court found? I don't remember the directly contradicts on a relevant issue, Your Honor. But even if let's assume, what I think he said was counter. But even if we say direct contradiction on a relevant issue. Yes. It's not an essential issue. And what the district court also said, as Your Honor's pointed out, is that Mr. Wilkes could offer this testimony. And Mr. Wilkes did. Justice defense counsel agreed that he could. Let me give you a more accurate quote. The court said it was admissible relevant testimony that would not be cumulative. It would be exculpatory. You disagree with that? Well, Your Honor, having seen the proffer, I absolutely disagree with that. But again, we're talking about a very tangential issue. It sounds to me like you're saying that if Williams had testified and he had been granted immunity, that you would have been able to convince the jury that because of the evidence of the bribery, they could ignore his testimony as a nonrelevant material. They could have or they could have accepted it entirely. Isn't that your point? Yes, Judge Alitone. Or they could have accepted it entirely and it still wouldn't have affected all the bribe activity that followed these goings on in Panama. Again, the disagreements between Mr. Wilkes and the government employees who were not immunized, those disagreements were important not because we had to prove the government employees were right because we were trying to establish procurement fraud. They were contextual to provide the backdrop for the unprecedented intervention and pressure that those government employees felt from Duke Cunningham, that they experienced from Duke Cunningham. So again, even if you accept it as true, even if you accept that the proffer was, as defense counsel maintained today, which it simply wasn't, as we can see in the record, but even if it was, and even if the jury accepted it, none of that has anything to do with the elements of the crimes charged here. And again, once again, context is the key here. This defense argument started out as, every government witness was immunized except ministerial ones. Once that was corrected, we're down to one witness, maybe two. Joel Combs, maybe one comment from Mitch Wade. The bulk of the testimony about the pressure from Cunningham and the disagreements over these projects came from non-immunized witnesses. Paul Behrens, not immunized. Gary Jones, not immunized. David Oliver, Frank Collins, Lou Kratz, these people were not immunized. And Mr. Wilkes, not only did he have the opportunity to testify himself and counter it, he could have, if it would have supported his position, he could have called any other former ADCS Inc. employee. In fact, if the goal was to undermine Joel Combs, they called another employee who said he was a ball dropper, which Mr. Wilkes' counsel acknowledged at the time, Mr. Wilkes himself confessed. We agreed to immunize, at their request, one of Mr. Combs' closest friends who was also employed by the company. They could have called him. They could have called the other individuals that worked for ADCS Inc. at that time down in Panama. They didn't. And what's critical is, not only does there have to be a distortion that The distortion has to be due to the failure to immunize. And that's why I think the Reagan case puts this in a much better context. I know it's an unpublished opinion, but it does put things in a better context. What we're talking about is putting a defendant in an unfair position, where the defendant, as in Straub, let's, again, context, Straub, one witness for the government puts the gun in the defendant's hand. One witness puts the defendant at the scene of the armed robbery. The witness, that was the one immunized witness. The witness the defense wanted to immunize, the proposed witness, said that very immunized witness had told him that he, the immunized witness, had just shot a man. And that immunized witness denied that. Could not possibly be a more essential aspect of that charge. Could not possibly be a more direct contradiction. And that is why Straub was decided the way it was. It's not because there was some tangential issue. In fact, that contradiction was ruled by the Straub court to be tangential to the other counts charged in that case. So when we get back to what this case was really about, which is bribery and political corruption, we put in the right perspective these minor disagreements over barcoding and billing for services and equipment. What about the argument Ms. Charlotte makes about being similarly situated, that Williams and Combs were similarly situated? Well, Judge O'Scannon, and there was no disagreement about this. Combs testified that he was called the project manager in Panama before Mr. Williams came on. Interestingly, Mr. Wilkes said that a man named Carlos Campos was really in charge of the Panama project before Mr. Williams came on. So Mr. Wilkes said there was another individual who was really more similarly situated to Williams than Combs was. They could have called him. They didn't. They chose the one witness who they knew defense counsel had not provided a proffer, the one witness who hadn't spoken to the government after being initially interviewed. And instead, they created this tension. That again, it's on a tangential issue, but there were alternatives. There were other individuals who were similarly situated to Mr. Williams. In Mr. Wilkes' own testimony, he identified one of those individuals who was more similarly situated than Mr. Combs. So again, we're talking about a tangential issue, and we're talking about a situation where there were alternatives available to Mr. Wilkes, but he chose not to avail himself of the alternatives of other witnesses. But he did avail himself on the one alternative the district court identified, and his counsel agreed. He could testify himself. These other government witnesses, so  These other government witnesses, they weren't immunized. So there was no selective use of immunity that created an imbalance. I asked Ms. Charlotte what should we do about it if we were to agree with her basic point that the judge didn't apply Straub because Straub was an extant at the time. What would you have us do? Your Honor, it is a de novo review. And what I would ask your honors to do is to look at this case from the perspective that I have argued this morning. Let's see, is it possible, even if we take everything that Ms. Charlotte said this morning as being true, and that would have come in as testimony from Mr. Williams, unrebutted from the government. Would that, against this record, demonstrate that Mr. Wilkes was deprived of his due process right to a fundamentally fair trial? Absolutely not. And since we're talking about what the district court said here, the district court repeatedly, and this is at the sentencing hearing, page 41 of the sentencing transcript at ER 3655, in context, this is talking about prosecutorial misconduct. In context, I find that none amounted to prosecutorial misconduct. None amounted to any kind of problem that deprived Mr. Wilkes of a fair trial. Next, at page 43 of the sentencing, ER 3657, Mr. Wilkes was fairly tried. He got a fair trial as I promised he would. Next at 160, it's not in the excerpt of record, but it's still in the reporter's transcript of the sentencing hearing. Likewise, I don't find it fairly debatable, and this is talking about the issues for appeal, which included this immunity issue. I don't find it fairly debatable or fairly doubtful that the government crossed the line in closing argument and said things that had the effect of prejudicing Mr. Wilkes' ability to get a fair trial. Next page, talk about the jury instructions. At page 162, Mr. Wilkes got a fair trial here. As the government said, and I've alluded to here, I've bent over backwards to ensure a fair process for him. And I think he got that at the end of the day. And so, Judge Silverman, to answer your question, even if we take unrebutted, and it's absolutely true, stipulated facts, everything that Sherlock said, it does not alter any of those conclusions. It does not alter the record in this case of overwhelming evidence of public corruption, of bribery. And for that reason, Judge Silverman, it does not raise even the specter of Mr. Wilkes being denied his due process right to a fundamentally fair trial. Again, we're talking about acts back in 1998, maybe leak into 1999.  That were overwhelmingly established at trial. So, my wish would be for the court to put those claims in the proper context, and even assume that they're accurate, decide this case as it can under de novo review as one in which Mr. Wilkes received a fair trial. And that, I think, would table the immunity issue. Your Honors, I know I'm running out of time. I'm happy to address any other questions. Roberts, no further questions, counsel. Thank you. Thank you, Your Honors. Ms. Charlock, you have a little reserve time. Thank you. I first want to start by saying that, from what I understand, the government's arguing that this error, if it was error, was harmless. And they didn't make that argument in the briefs. I heard Judge Silverman earlier, but I do think that they've waived that claim. But regardless, even if they hadn't, there's no way that admit that refusing to admit Williams' testimony could be harmless error. The Panama Project was a huge focus of the case. Five trial days, nine witnesses, and yes, they used it to set the scene for a case where they had no express quid pro quo for that bribe. They used it to try to poison the jury. It was very prejudicial that Mr. Wilkes was overbilling, he did lousy work. You know, he was cheating the government at every turn and he got the contract because of bribery. They've perpetuated that. That actually was completely inaccurate. He got the contract because Ann Barnes from the Department of Defense gave it to him. Excerpt of record 1720. Witnesses were asked, did Cunningham have anything to do with that contract? Excerpt of record 963, Frank Collins, not that he knew of. And Randall Curley, excerpt of record 1070, 1071, didn't know how Mr. Wilkes got the contract. It is false that he got it through bribery. Additionally, the fact that Mr. Wilkes didn't challenge the sufficiency of the bribery conviction, it's pretty hard to win on a sufficiency argument in front of the Court. But Mr. Wilkes offered explanations of innocence as to every one of those acts, the Kelly C., the $525,000, along with the Panama stuff. If credited, they entitled him to an acquittal. And it seems a bit like cheating to claim, well, you know, he was out there alone. It was only Mr. Wilkes, so you have to believe him or all these government witnesses when you excluded the one disinterested person who would have corroborated him and made credible his explanations of innocence on every one of these things. Do I understand correctly you're not challenging the bribery conviction? As a matter of the sufficiency of the evidence, but if the Court decides there was a due process violation, that conviction fails. With respect to the immunity? Yes. Yes, absolutely. And, Your Honor, the judge at the sentencing hearing also found that Mr. Garagos had the first ten witnesses either neutralized or turned around. That's before Combs and Wade testifies, and that's excerpt of Record 3629. Combs and Wade, the lynchmen, were the ones that Williams directly contradicted. And the effect of that contradiction, Straub has been patently clear, goes beyond just the statement in and of itself. Straub didn't offer, didn't require that any other witnesses be found and located. This was the best witness. Mr. Garagos found this witness, brought this witness to the Court, and asked for an inquiry. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Alarcon, O'scannlain, Silverman